AMERICAN GENERAL INS. CO. v.
WEBSTER et al.

No. 3283.

Court of Civil Appeals of Texas. Beaumont.

May 30, 1938.

Rehearing Denied July 27, 1938.

Vinson, Elkins, Weems & Francis, of Houston, for appellant.

O. M. Lord and D. E. O'Fiel, both of Beaumont, for appellees.

COMBS, Justice.

This a compensation case. Brown & Root, Inc., a road contracting firm, was the employer, Earl Webster was the employee, and appellant, American General Insurance Company was. the compensation insurance carrier. Appellees, who are the widow and minor children of Earl Webster, deceased, brought this suit on the theory that Webster died as the result of a heatstroke received in the course of his employment. They plead:

"That on or about the 16th day of June, 1936 the said Earl Webster, Sr., was in the employ of the Brown & Root, Incorporated at or near Hamshire in Jefferson County, Texas, in the capacity of a laborer, that on said date, while in the course of his employment as such, he sustained injuries resulting in his death, to-wit: Plaintiffs show that on or about the said 16th day of June, 1936, while the said Earl Webster, Sr., was performing the duties of his employment with his employer aforesaid, and while working and engaged in the work of building and constructing a highway between Hamshire and Fannett in Jefferson County, Texas, as aforesaid, that the said Earl Webster, Sr., had to exert and strain himself, the work he was performing requiring a great deal of strength, shoveling sand at about 1:30 P.M., the sun was very hot and no shade available and that while in the act of performing the duties required of him by his employer, he was overcome by the heat and suffered a heat stroke, which caused him to become sick and nauseated and fall out and as a result of same, the said Earl Webster died on said date; that the conditions surrounding his employment created a condition of greater hazard, and that the said Earl Webster, Sr., was exposed to greater heat and exposure hazard than the public was generally exposed to, and that on account of same, the conditions surrounding his employment brought about and resulted in the death of the said Earl Webster, Sr., as aforesaid. That his employer, Brown & Root Incorporated furnished their employees water to drink out of a barrel and that said water was not iced, and that the same was brackish, with an ill taste. That the said water was dirty and unwholesome. And that when said Earl Webster, Sr., the deceased, became overheated and exhausted as aforesaid, he drank a quantity of said hot and ill-tasting water. That immediately thereafter he suffered severe nausea, acute gastritis and pains in his chest and stomach and abdomen, that grew worse and caused his death, due either to the heat prostration as aforesaid and/or the drinking of said foul and unwholesome hot water that had been provided by the employer."

The proof, although somewhat conflicting in the details, showed that Webster was employed as a common laborer in highway construction work for Brown & Root for some months prior to the time of the alleged heatstroke, that he worked regularly when it was not raining. He was 39 years of age and apparently in good health. Some witnesses testified that he was sick on June 15th. Others said he was not. On the 16th day of June, 1936, in the afternoon he was engaged in shoveling sand into a wheelbarrow and pushing it some distance and emptying it into a concrete mixer. He went to the water barrel and got some water, complaining to a fellow employee that he had taken sick and did not think he could make it. He placed his hand upon his stomach and chest. One witness said he appeared to be sick and burned out. He pushed two more barrows of sand and said he could

not go any farther. He was carried to the office in a car and when he arrived there he was unconscious. He was placed in an automobile and another employee started to bring him to Beaumont for medical attention. The driver of the car testified that Webster's head rested on his (the driver's) lap and before they reached Fannett, a few miles from the place where Webster had been working, he noticed a rattling or gurgling sound in Webster's throat, and by the time they reached Fannett he was dead. A fellow employee testified that the weather was very hot at the time Webster fell out and that the work Webster was doing, shoveling sand and pushing a wheelbarrow was heavy, arduous work and the weather hot. The fellow employee who took Webster's place when he had to quit testified that the wheelbarrow of sand had to be pushed rapidly as the concrete mixer was waiting for the sand. Some witnesses place the time of day when Webster quit work as 1:30 and others placed it at 3:30 or 4 o'clock in the afternoon. Some other witnesses testified that the weather was not hot for the time of year, but was inclined to be mild, and that a breeze was blowing. However, the records of the State Experiment Station at Amelia, a few miles away from the scene of the work, showed that for the day in question the maximum temperature was 97 degrees, and for the 12 hour period covering the day of June 16th, 65 miles of wind passed the Experiment Station. Mr. Wyche, superintendent of the Experiment Station, testified that that amount of wind was below the average. His records did not show the wind velocity for any particular time during the day. The place where Webster and his fellow employees were working was in open country on a wide cleared right-of way.

Dr. Seab J. Lewis, a pathologist who performed an autopsy on the body, testified that, based upon his findings, it was his opinion Webster died from heart disease, "that is myocarditis with artierio schlerosis of the coronaries, associated with acute gastritis". He found a serious condition of the heart and hardening of the arteries. On cross-examination, Dr. Lewis testified that the meninges or covering of the brain, also the liver, lungs and other organs of the body were gorged with blood and that such conditions were usually present in cases of heatstroke. He said that heat exhaustion would throw an added weight or burden on the heart. He further testified in effect that he did not take into consideration heatstroke as he didn't think that was up to him.

Dr. Darwin, who testified as an expert, gave as his opinion that Webster died of heatstroke.

The jury found in substance that Webster died of heatstroke, an injury received in the course of his employment; that his work at the time exposed him to greater hazards of heatstroke than those to which the public generally was exposed; that his death was not due to heart disease independent of the injury; that his death was not due to acute gastritis independent of the injury; that his death was not due to natural causes independent of the injury. On the verdict of the jury the trial court entered judgment for plaintiffs, and the insurance company has appealed.

### Opinion.

 We overrule appellant's contention that plaintiff's petition did not allege an unconditional cause of action. The portion of the petition complained of is set out above. As we read it, it charged death from "heat prostration as aforesaid and/or the drinking of said foul and unwholesome hot water that had been provided by the employer." The defendant leveled no special exceptions at the petition but relied solely upon its general demurrer. Resolving all reasonable intendments in favor of the pleadings, as we must do against a general demurrer, heatstroke was alleged as the ground of recovery. The drinking of unwholesome water was alleged as a contributing cause to the heatstroke, and not as an independent ground of recovery.

Incidentally, we will remark that we would probably be warranted in considering that part of the sentence following "and/or" as meaningless, for to our way of thinking the abominable invention, "and/or", is as devoid of meaning as it is incapable of classification by the rules of grammar and syntax. But, if it can be given any meaning at all, it is subject to the construction which we have given it.

 We also overrule the contention that the evidence did not raise the issue of death by heatstroke. The evidence was conflicting in certain respects but the issue was clearly raised and it was the province of the jury to resolve the conflict. The proof

satisfactorily supports the finding of death by heatstroke.

We overrule the further contention that there was no evidence that the deceased was subject to any greater danger from heatstroke than the public generally. Our Supreme Court has held that heatstroke is an accidental injury. Bryant v. Continental Casualty Co., 107 Tex. 582, 182 S.W. 673, 675, L.R.A.1916E, 945, Ann. Cas.1918A, 517; International Travelers' Ass'n v. Francis, 119 Tex. 1, 23 S.W.2d 282. Disability or death resulting from heatstroke is compensable when it arises out of the work or employment. O'Pry v. Security Union Casualty Co., Tex.Com. App., opinion adopted by Sup. Ct., 1 S.W.2d 590; Hebert v. New Amsterdam Casualty Co., Tex.Com.App., 1 S.W.2d 608; Texas Indemnity Ins. Co. v. Dean, Tex.Civ.App., 77 S.W.2d 748; Texas Employers' Insurance Ass'n v. Moore, Tex.Civ.App., 279 S.W. 516; New Amsterdam Casualty Co. v. Humphrey, 5 Cir., 47 F.2d 57. It is, of course, the rule, as contended by appellant that to be compensable the heatstroke must originate in the business of the employer and at a time when the employee is engaged in the performance of duties that subject him to greater hazards from heatstroke than applied to the general public. The location of the place of work and the condition of the premises may constitute such extra hazard, in whole or in part. In the Hebert Case, supra, Judge Nickles made reference not only to the heavy work Hebert was doing and the hot weather, but to the fact that he was in a forest which tended to shut off the breeze, which intensified the sun's heat. In the O'Pry Case, supra, the natural heat was much intensified by artificial conditions of the plant in which O'Pry worked. But we do not understand the rule to be that there must be some particular condition of "the premises", where the employee is working, that is of itself conducive to heatstroke in order that recovery may be had. The extra hazard may be supplied by the very nature of the work itself. It is a known fact, and was so testified by a medical witness in the instant case, that heavy exertions tend to generate a great deal of bodily heat. And while in certain other regions heatstroke often occurs from the action of the elements alone, it is a matter of common knowledge that in Texas it rarely occurs from direct exposure to the rays of the sun in hot weather, or other conditions of natural heat, unaccompanied by physical exertion. In the case before us the evidence was sufficient to warrant the jury in the conclusion that at the time Webster received the heatstroke he was doing heavy, fast work; he was exposed to the direct rays of the sun in the afternoon of a day in June when the maximum temperature was 97 degrees; and that the work he was doing contributed to bring about the heatstroke. But for the physical exertion incident to the work it likely would not have occurred, and so the injury had its origin in the work or employment of the employer, and was compensable. We are well aware that in certain other jurisdictions a more strict rule has been applied by the courts in similar cases. See Wax v. Des Moines Asphalt Paving Corp., 220 Iowa 864, 263 N.W. 333; Bellinger v. Hersey Gravel Co., 267 Mich. 26, 255 N.W. 443. But in Texas, our courts have consistently followed a liberal rule allowing recovery of compensation insurance for injuries received by employees from so-called acts of God. See Southern Surety Co. v. Stubbs, Tex.Civ.App., 199 S.W. 343, writ refused; Security Union Cas. Co. v. Brown, Tex.Civ.App., 297 S.W. 1081, writ refused; U. S. Fidelity & Guaranty Co. v. Rochester, Tex.Civ.App., 281 S.W. 306, affirmed, 115 Tex. 404, 283 S.W. 135; Texas Employers' Ins. Ass'n v. Moyers, Tex.Civ.App., 69 S. W.2d 777. An interesting summary of holdings of the Texas courts on the point will be found in Lawler's "Texas Workmen's Compensation Law", pages 122, et seq. Our compensation statute, V.R.S., Art. 8309, Sec. 1, in defining the term "injury" excludes an injury caused by the act of God "unless the employee is at the time engaged in the performance of duties that subject him to a greater hazard from the act of God responsible for the injury than ordinarily applies to the general public". The interpretation given to the provision by the practical application of it in adjudicated cases by the courts of our state is to exclude injuries caused by storms, lightning, heatstroke, and other acts of God which do not have their origin in the employment. But where the work or employment of the employee is a contributing factor in bringing about the injury, it is compensable. In the case before us the very work which the deceased was doing for his employer exposed him to greater hazard from heatstroke than the general public was exposed to for the simple reason that the

general public were not pushing wheelbarrow loads of sand in the hot sun on that day.

 The trial court did not err in refusing to submit to the jury a requested issue of the defendant as to whether the deceased died from the effect of drinking foul drinking water. There was no evidence that deceased died from such cause except as bearing upon defendant's contention that the deceased died from acute gastritis, and that such condition might have been brought about by the drinking of impure water. Issues embodying that theory of the defendant were submitted to the jury and answered against the defendant.

We will notice but one other assignment. Appellant assigns error against the admission of the testimony of Dr. Darwin to the effect that in his opinion Earl Webster died of heatstroke, for the reason that a sufficient predicate was not laid in the question. The question was:

"Suppose a man about the size and type and age of Earl Webster—you say you knew him? A. Yes, sir.

"Q. About thirty-seven years old, who had apparently been in good health five or six years, and who went to work and began work about noon, shoveled sand and wheeled a wheelbarrow in the sun; that about 1:30 o'clock P. M. he complained of pain and began to vomit, complained of pain in his chest and stomach at about 1:30 or 2 o'clock P. M., and that he was carried, that is they began to carry him to a doctor in Beaumont and en route to Beaumont he became unconscious and a gurgling or rattling sound was heard in his throat, and he was afterwards found to be dead in a short time afterward. Those facts being true, Doctor, what would you attribute the death of the man to? * * * A. I would certainly say that he had heat prostration, heat shock had a great deal to do with his death."

 On cross-examination he explained what he took into consideration in giving his opinion by saying that he considered "the fact that summer was existing. It was in June, about midday, when the rays of the sun are more or less direct, and you have the most detrimental effect upon one; the fact that he became nauseated; the fact that prior to this he was apparently in good health, the fact that he was doing a type of work that generated much heat." The assignment does not present a situation where the predicate considered by the witness contained matters of hearsay or other matters which could not properly form the basis for the answer. Instead, it is merely insisted that the predicate did not supply sufficient facts in order for the witness to form a conclusion. The witness was testifying as an expert. Whether the predicate was sufficient for him to form a conclusion was for the witness to decide, that being a matter as much subject to expert opinion as the answer itself. If the predicate was not sufficient, defendant could have attacked the testimony by expert testimony to that effect. The question of whether the predicate was sufficient went to the weight and not to the admissibility of the evidence.

The judgment of the trial court is affirmed.